## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND RESIDENTIAL SEARCH WARRANT APPLICATIONS

I, Tam Vieth, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.    I submit this affidavit to establish probable cause in support of separate applications for a criminal complaint charging three individuals with a federal drug offense and a search warrant for a residence used by the proposed defendants for the preparation, storage, and distribution of controlled substances.

     a.    Based on the information below, I am applying for a Criminal Complaint charging the following individuals with conspiring to distribute and possess with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841 and 846 between April 30, 2023, and the present: Marvin BYRD (also known as "TJ") and Britny PARRIS.

     b.    Also based on the information below, pursuant to Federal Rule of Criminal Procedure 41, I am applying for a search warrant authorizing the search of the residence of Britny PARRIS located at 194 West Street in Barton, Vermont (the SUBJECT PROPERTY), which is located within the District of Vermont. The SUBJECT PROPERTY is described with greater particularity in Attachment A. Based on the facts set forth in this affidavit, I believe there is probable cause to search the SUBJECT PROPERTY for evidence relating to violations of 21 U.S.C. §§ 841 and 846—conspiracy to distribute and possess with intent to distribute controlled substances. The categories of items to be seized from the search location are listed in Attachment B.

2.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and I have been since 2014. In my capacity as a Special Agent, I am familiar with the federal laws relating to the possession and transfer of firearms as well as laws relating to

1

the distribution of, possession with the intent to distribute, and conspiracy to distribute controlled substances. I have been trained in the investigation of violations of those laws, and I have participated in many such investigations. I have applied for and executed search warrants related to those violations, including searches of residences, searches of electronic devices, and searches of location information for electronic devices and vehicles. I have participated in all phases of investigations of those violations, including interviews with firearm purchasers who traded firearms for controlled substances and with users and distributors of controlled substances. As a result of my participation in these investigations, I am familiar with the techniques employed by distributors of controlled substances and their means of acquiring, transporting, storing, preparing, and distributing controlled substances; their means of collecting, transporting, and transferring the proceeds of controlled substances; and their means of acquiring, using, and trafficking firearms in connection with the controlled substance violations. Among those investigations, I have specifically participated in the investigation and prosecution of controlled substance and firearms crimes in the "Northeast Kingdom" of Vermont in Orleans, Essex, and Caledonia Counties.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses in the course of this investigation. This investigation has involved a collaboration with the Northern Vermont Drug Task Force (NVDTF), ATF, the Federal Bureau of Investigation (FBI), and the Vermont State Police (VSP), as well as other assisting law enforcement organizations. I have personally participated in many aspects of this investigation, and I have reviewed information from other investigators, from business records and recordings, from law enforcement reports and affidavits, and from interviews with witnesses involved. When a

2

statement of another individual is included herein, it is presented in sum and substance, unless it is shown to be quoted directly. This affidavit is intended to show only that there is probable cause for the requested complaints and search warrant, so it does not set forth all of my knowledge about this matter.

## Probable Cause

4.    In March 2023, NVDTF started an investigation into the distribution of fentanyl and cocaine base in the Orleans County area of Vermont. The targets of the investigation were Marvin BYRD, Jr. (also known as "TJ," whose year of birth is 1995), "MONEY" (whose identity is currently unknown), and PARRIS (year of birth 1989). NVDTF had received information from a cooperating individual (referred to herein as CI-1 and "s/he" and "him/her") that BYRD (known to CI-1 as "TJ"), MONEY, and PARRIS were actively selling fentanyl and cocaine base (colloquially known as "crack") in collaboration with one another in and around the town of Orleans, Vermont. Another individual cooperating with NVDTF (referred to herein as CI-2 and "s/he" and "him/her") had informed detectives that PARRIS was actively selling crack and fentanyl in Orleans County. During the ensuing investigations described below, NVDTF determined the investigations overlapped, and PARRIS was hosting BYRD, MONEY, and other narcotic sources in her residence (the SUBJECT PROPERTY) for the purpose of storing and distributing drugs.

        a.    CI-1 was assisting NVDTF for monetary compensation which was not contingent upon the identity of the target(s) of the investigation. Based on CI-1's statements to NVDTF, CI-1 is a recovering cocaine user. CI-1 has previously worked for NVDTF and provided credible information in the past. CI-1 has no felony convictions, but s/he has a misdemeanor conviction for providing false information to law

3

enforcement. Since CI-1's misdemeanor conviction, however, CI-1 has conducted controlled purchases of narcotics at the direction and under the supervision of NVDTF; some of those purchases led to pending drug cases in the State of Vermont court system and the prosecution of several individuals in the United States District Court for the District of Vermont. Based on CI-1's performance since the misdemeanor conviction, the NVDTF detectives believe CI-1 is a reliable and credible source of information.

b. CI-2 was assisting NVDTF for monetary compensation which was not contingent upon the identity of the target(s) of the investigation. Based on CI-2's statements to NVDTF, CI-2 was not a narcotic user at the time of the investigation. CI-2 had previously worked for NVDTF in a separate investigation. Detective Aaron Lefebvre (a member of NVDTF) discovered no criminal convictions for CI-2 when he ran a criminal history check. CI-2's statements to NVDTF investigators in the course of this investigation were corroborated by investigators' observations and surveillance during the investigation, so the NVDTF detectives believe CI-2 is a reliable and credible source of information.

5. During March 2023 and April 2023, NVDTF conducted four separate controlled purchases at three different residences in Orleans County using CI-1. During each controlled purchase, "TJ" (later identified as BYRD, as described below) either coordinated or directly conducted the controlled substance transaction. If BYRD did not directly conduct the controlled purchase, he participated in the transaction by arranging it with CI-1 and sending another individual to complete it. In each controlled purchase, suspected fentanyl was purchased by CI-1 and seized as evidence. During that period, BYRD's actual identity was unknown, and he was known to his customers and law enforcement as TJ.

a. During those initial controlled purchases, BYRD had used two confederates to distribute controlled substances on his behalf. Those confederates were later identified as Timothy Guyette and Travis Columbia. Guyette and Columbia were living in separate residences in Orleans County and were reported by CI-1 to have been previously hosting BYRD for the purpose of distributing controlled substances. CI-1 informed NVDTF s/he witnessed BYRD being present during a controlled purchase at Columbia's residence.

b. On April 2, 2023, Guyette reported to VSP that BYRD had assaulted him and threatened his life with a firearm. Guyette reported he had previously purchased drugs from BYRD and allowed BYRD (whom Guyette knew as "TJ") to stay at his residence for the purpose of drug distribution. Guyette advised that he had gotten into an argument with BYRD and that BYRD had punched him in the face. Guyette stated BYRD grabbed a pistol from his (BYRD's) waist band and said he (BYRD) would shoot him (Guyette). Guyette stated he was scared for his life regarding the threat and no longer wanted BYRD at his residence. VSP Detective Trooper Steven Fauteux (a member of NVDTF) thereafter spoke with Guyette by phone, and Guyette stated BYRD had brandished a firearm and that he took the threat seriously. BYRD had informed Guyette that he (BYRD) would make Guyette disappear and that no one will find him. During Guyette's discussion with law enforcement, he provided a description of the vehicle BYRD was operating. Law enforcement located the vehicle matching the description in Orleans County and attempted to conduct a traffic stop on April 2, 2023. The vehicle failed to yield and successfully eluded law enforcement, who terminated a pursuit for public safety.

5

c. During a controlled purchase in the week of April 16, 2023, CI-1 was able to acquire a video recording that depicted BYRD's face through the use of an Audio/Video Recording Device ("AVRD") provided to CI-1 by NVDTF for the purpose of the controlled purchase. NVDTF investigators sent a still frame of BYRD's face to law enforcement partners in Massachusetts and Connecticut. Law enforcement partners in Hartford (Connecticut) tentatively identified the individual depicted as Marvin BYRD, Jr. Detective Trooper Fauteux obtained an unmarked photograph of BYRD from the Connecticut Department of Motor Vehicles and presented the photograph to CI-1; CI-1 identified the photograph as TJ without hesitation.

d. For each of these controlled purchases during that period, CI-1 contacted BYRD using phone number 802-487-4459 that had was provided to CI-1 by BYRD for the purpose of purchasing drugs. Based on Detective Trooper Fauteux's training and experience, it is not uncommon for drug sources to provide their phone numbers to potential customers to promote drug sales and to potentially gain more customers.

*Week of April 30, 2023 – Controlled Purchase Arranged through BYRD*

6. During this investigation, multiple controlled purchases of narcotics were arranged with BYRD, MONEY, and PARRIS using CI-1. One of the controlled purchases was conducted during the week of April 30, 2023.

a. Prior to the controlled purchase, CI-1 contacted BYRD (known to CI-1 as "TJ" from prior interactions with him) at the direction of NVDTF via text messages exchanged with 802-487-4459. Investigators later observed the exchanged messages. In

6

the exchanged messages, BYRD directed CI-1 to go to a specific address in Barton, a town in Orleans County, Vermont to purchase 50 baggies of fentanyl.

b. Investigators with NVDTF employed standard controls during this and the other controlled purchases described below. For example, investigators met with CI-1 prior to the transaction and searched CI-1 and CI-1's vehicle to determine if s/he possessed any cash or controlled substances. CI-1 was then provided with prerecorded currency for the planned purchase and audio/video recording and audio transmitting devices so the investigators could monitor the transaction in real time and review recordings after the event to corroborate CI-1's statements about the event. Investigators provided surveillance of the transaction location and of CI-1 from the time CI-1 met with the investigators before the event until CI-1 met with investigators after the event (except when CI-1 was inside of a structure or vehicle for the transaction). CI-1 was then searched again after the event to ensure s/he did not possess any controlled substances or currency that was not surrendered to the investigators following the transaction. CI-1 then provided a sworn statement about the transaction and the events surrounding it.

c. During the controlled purchase—which occurred at a residence located at 194 West Street in Barton, Vermont (the SUBJECT PROPERTY), as directed by BYRD— CI-1 provided $200 to an unknown male and received 48 glassine baggies of suspected fentanyl from PARRIS in fulfillment of the transaction arranged with BYRD via text messages and phone calls. In the post-transaction sworn statement, CI-1 stated that s/he provided the $200.00 to the unknown male and that PARRIS provided the fentanyl to him/her. CI-1 did not interact with TJ on this occasion. Following the transaction, CI-1 surrendered the purchased substance to NVDTF investigators.

7

d.   The surrendered substance was field tested by Detective Trooper Fauteux. The substance in the glassine baggies tested presumptively positive for the presence of fentanyl using a Narcotics Analysis Reagent Kit (NARK II).

e.   Investigators later reviewed recordings of the event from devices provided to CI-1, and the recordings corroborated CI-1's description of the transaction with the unidentified male and PARRIS.

f.   Following this controlled purchase, FBI Special Agent Colin Simons applied for a warrant to obtain precision location information about BYRD's cell phone.  On May 8, 2023, the Honorable United States Magistrate Judge Kevin J. Doyle granted the warrant (filed under case number 2:23-mj-55).  Investigators began receiving location information pursuant to that warrant on May 10, 2023.  While monitoring the TARGET PHONE location data over the following thirty days, VDTF investigators observed the phone to be consistently located, for periods ranging from several hours to approximately ten days, at or near a residence at 194 West Street in Barton, Vermont (the SUBJECT PROPERTY) where the recent controlled purchases had been conducted.


*Week of May 7, 2023 – Controlled Purchase Arranged through PARRIS*

7.   During the week of May 7, 2023, investigators made a controlled purchase from individuals at the SUBJECT PROPERTY using CI-2.  Prior to the controlled purchase, CI-2 contacted PARRIS at the direction of NVDTF via Facebook Messenger with PARRIS using the "Britny Wells" (https://www.facebook.com/parris.britny201) profile name.

a.   Detective Lefebvre observed the exchanged messages, which set up a transaction for a "bun" (a "bundle" or ten baggies packaged together) of heroin/fentanyl.

Although no location was designated in the messages, CI-2 was familiar with the SUBJECT PROPERTY and understood that was where the transaction was to take place.

b. Similar controls were employed during this purchase, in that CI-2 was briefed and searched prior to the purchase, was provided with recording and transmitting equipment, was provided prerecorded currency for the purchase, was surveilled to and from the purchase location, and was searched and debriefed after the purchase.

c. During a sworn statement after the resulting transaction, CI-2 indicated s/he had arrived at the SUBJECT PROPERTY and provided PARRIS with the $60 that investigators had given to CI-2 for the purpose. CI-2 stated PARRIS went back inside her residence. CI-2 stated PARRIS had told him/her that a drug source was inside the residence. A short while later, PARRIS returned and handed CI-2 the suspected fentanyl, which was in a single baggie that was supposed to contain ten baggies' worth of the drug.

d. CI-2 had surrendered the suspected fentanyl to NVDTF investigators following the transaction. The substance was field tested by Detective Trooper Fauteux using an NIK test kit. The substance tested presumptively positive for the presence of fentanyl and weighed approximately 0.32 grams (inclusive of packaging).

e. Investigators later reviewed recordings of the event from devices provided to CI-2, and the recordings corroborated CI-2's description of the transaction with the PARRIS. PARRIS's face was clearly visible during her interaction with CI-2, and PARRIS could be seen accepting the $60 during the transaction.

*Week of May 14, 2023 – Controlled Purchase Arranged through BYRD*

8. During the week of May 14, 2023, investigators made a controlled purchase from individuals at the SUBJECT PROPERTY using CI-1.

a. Prior to the meeting, CI-1 was instructed by NVDTF detectives to contact BYRD via text messages exchanged with number 802-487-4459. Detectives later observed the text messages, and during the conversation BYRD wrote "yeah, I'm right here", which CI-1 understood to mean the SUBJECT PROPERTY. CI-1 informed BYRD s/he would be there shortly and would need a 50 baggies of fentanyl.

b. Similar controls were employed during this purchase, in that CI-1 was briefed and searched prior to the purchase, was provided with recording and transmitting equipment, was provided prerecorded currency for the purchase, was surveilled to and from the purchase location, and was searched and debriefed after the purchase.

c. Following the transaction, CI-1 rejoined the NVDTF investigators and surrendered a clear knotted plastic bag containing suspected fentanyl and provided a sworn statement about the transaction. CI-1 had initially contacted BYRD via text message and asked about purchasing a certain amount of fentanyl. CI-1 advised BYRD informed him/her that he was at PARRIS' residence. CI-1 stated that s/he met with PARRIS at her Barton residence and handed PARRIS the $200 that investigators had given to CI-1 for the purpose. After waiting outside for a few minutes, PARRIS returned and gave CI-1 a clear knotted bag containing the suspected fentanyl.

d. CI-1 had surrendered the suspected fentanyl to NVDTF investigators following the transaction. The substance was field tested by Detective Trooper Fauteux using an TruNarc drug analyzer. The substance tested presumptively positive for the presence of fentanyl and weighed approximately 2.8 grams (inclusive of packaging).

10

e. Investigators later reviewed recordings of the event from devices provided to CI-1, and the recordings corroborated CI-1's description of the transaction with PARRIS. PARRIS's face was clearly visible during her interaction with CI-1, and PARRIS could be seen taking the currency during the transaction.

f. NVDTF believed PARRIS had been living at the residence on 194 West Street with an individual identified as her boyfriend or fiancé, Derek Wells. I am aware that Britny PARRIS also uses the last name of Wells occasionally, as in her Facebook account noted above. Up to that point in the investigation, however, NVDTF had not observed Wells at the residence. CI-1 and CI-2 have informed detectives, however, that they have seen Wells at the residence during controlled purchases. Following this transaction, CI-1 was shown a photograph of Wells, and CI-1 stated s/he recognized the person and believed he was PARRIS's boyfriend.

*Week of May 14, 2023 – Controlled Purchase with PARRIS*

9. Also during the week of May 14, 2023, investigators made a controlled purchase from individuals at the SUBJECT PROPERTY using CI-2.

a. In the presence and observation of the NVDTF, CI-2 contacted PARRIS via Facebook Messenger. CI-1 had previously communicated with PARRIS using the same Facebook profile mentioned above. At the direction of detectives, CI-1 arranged a $160 transaction for amounts of heroin/fentanyl and cocaine base. Detective Lefebvre observed messages exchanged between CI-2 and the "Britny Wells" profile. Although no location was designated in the messages, CI-2 was familiar with the SUBJECT PROPERTY and understood that was where the transaction was to take place.

11

b. Similar controls were employed during this purchase, in that CI-2 was briefed and searched prior to the purchase, was provided with recording and transmitting equipment, was provided prerecorded currency for the purchase, was surveilled to and from the purchase location, and was searched and debriefed after the purchase.

c. Upon meeting with NVDTF detectives after the transaction, CI-2 surrendered a small package weighing approximately 1.8 grams (inclusive of the packaging) that contained suspected fentanyl and a clear plastic sandwich bag containing suspected cocaine base weighing approximately 0.31 grams (inclusive of the packaging) to the investigators. In a sworn statement, CI-2 described having set up the transaction with PARRIS using Facebook at the direction of Detective Lefebvre. CI-2 met PARRIS at the SUBJECT PROPERTY outside of the house. CI-2 received the suspected drugs from PARRIS in exchange for $160 that NVDTF had provided to CI-2 for the purpose. CI-2 indicated the one bag of suspected fentanyl was supposed to contain the amount that would ordinarily be in 10 baggies.

d. The suspected controlled substances were later field tested by Detective Lefebvre using a NIK test kit. The substance in glassine baggies tested presumptively positive for the presence of fentanyl, and the substance in the sandwich baggie tested presumptively positive for the presence of cocaine.

e. Investigators later reviewed recordings of the event from devices provided to CI-2, and the recordings corroborated CI-2's description of the transaction with the individual identified as PARRIS. PARRIS could be seen taking the currency during the transaction and later handing CI-2 a waxy bag containing the suspected fentanyl.

*Week of June 4, 2023 – Controlled Purchase Arranged through BYRD*

10. During the week of June 4, 2023, investigators made a controlled purchase from individuals at the SUBJECT PROPERTY using CI-1.

    a. Under the observation of detectives, CI-1 exchanged text messages with BYRD at 802-487-4459 to arrange a purchase a fentanyl. In one message, BYRD wrote "I'm here", which CI-1 understood to be the same location as the prior controlled purchase (the SUBJECT PROPERTY).

    b. Similar controls were employed during this purchase, in that CI-1 was briefed and searched prior to the purchase, was provided with recording and transmitting equipment, was provided prerecorded currency for the purchase, was surveilled to and from the purchase location, and was searched and debriefed after the purchase.

    c. Upon rejoining the NVDTF investigators after the transaction, CI-1 surrendered 50 glassine bags containing suspected fentanyl/heroin and provided a sworn statement about the transaction. CI-2 had contacted BYRD via text messages and arranged the transaction. Upon arriving at the Barton residence, CI-1 met with PARRIS. CI-1 gave PARRIS the $200 that had been provided by NVDTF for the purpose. CI-1 waited outside while PARRIS closed the door for a few minutes. PARRIS then returned and provided the 50 bags of suspected drugs to CI-1.

    d. Detective Todd Baxter (a member of the NVDTF) later tested the suspected controlled substances in the glassine bags using a NARK II, and it tested presumptively positive for the presence of fentanyl.

13

e. Investigators later reviewed recordings of the event from devices provided to CI-1. The recordings corroborated CI-1's description of the transaction with the individual identified as PARRIS, who was visible on the video recording.

*Week of July 16, 2023 – Controlled Purchase Arranged through BYRD*

11. During the week of July 16, 2023, investigators made a controlled purchase from individuals at the SUBJECT PROPERTY using CI-1.

a. Prior to the meeting, Detective Fauteux had directed CI-1 to contact BYRD via phone number 802-487-4459 to arrange a transaction. On the day of the controlled purchase, CI-1 spoke with Byrd via a phone call, and BYRD told CI-1 to go to a location CI-1 understood to be PARRIS's residence (the SUBJECT PROPERTY). Under the direction and observation of NVDTF, CI-1 then exchanged messages with PARRIS via Facebook Messenger under the profile name "Britny Wells" to purchase heroin/fentanyl. PARRIS had informed CI-1 "they" (which detectives understood to mean drug sources) knew s/he was on the way to the residence purchase drugs.

b. Similar controls were employed during this purchase, in that CI-1 was briefed and searched prior to the purchase, was provided with recording and transmitting equipment, was provided prerecorded currency for the purchase, was surveilled to and from the purchase location, and was searched and debriefed after the purchase. NVDTF provided CI-1 with $250 for the purchase of heroin/fentanyl.

c. Upon rejoining the NVDTF investigators, CI-1 surrendered numerous glassine wax baggies bound by a rubber band and provided a sworn statement about the transaction. CI-1 advised s/he contacted BYRD and was informed to go to PARRIS's

residence. CI-1 then contacted PARRIS and confirmed s/he could go to the residence. CI-1 described having met with an unknown male using the street name of "MONEY" at the SUBJECT PROPERTY. CI-1 gave MONEY the $250 that NVDTF had provided for the purpose. CI-1 received numerous bags of suspected fentanyl from MONEY in exchange. CI-1 advised MONEY asked for CI-1's phone number. CI-1 described MONEY as a young African American male with shoulder-length dreadlocks who was wearing a white shirt and camouflage pants.

    d. Detective Trooper Fauteux later tested the suspected controlled substances in the glassine bags using a NARK II, and the substance tested presumptively positive for the presence of fentanyl.

    e. Investigators later reviewed recordings of the event from devices provided to CI-1. The recordings corroborated CI-1's description of the transaction with MONEY, whose face was visible on the video recording.

*Week of July 23, 2023 – Controlled Purchases Arranged through MONEY*

12. During the week of July 23, 2023, investigators made a controlled purchase from individuals at the SUBJECT PROPERTY using CI-1. Prior to the controlled purchase, CI-1 informed NVDTF that MONEY had contacted CI-1 via text messages and phone calls.

    a. At NVDTF direction and under their observation, CI-1 communicated further with MONEY using texts and phone calls. Detective Trooper Fauteux observed messages exchanged between CI-1 and MONEY. MONEY ultimately informed CI-1 he had narcotics available, and CI-1 stated s/he needed a certain amount of fentanyl.

15

b. Similar controls were employed during this purchase, in that CI-1 was briefed and searched prior to the purchase, was provided with recording and transmitting equipment, was provided prerecorded currency for the purchase, was surveilled to and from the purchase location, and was searched and debriefed after the purchase. NVDTF provided CI-1 with $280 for the purchase of heroin/fentanyl. VSP Detective Sergeant Karl Gardner (a member of NVDTF) observed CI-1 arrive at the residence (the SUBJECT PROPERTY) and then depart approximately 2 minutes later. CI-1 then met with the investigators and surrendered numerous white glassine wax baggies bound by a rubber band containing the suspected fentanyl.

c. CI-1 provided a sworn statement about the transaction, stating s/he contacted MONEY via the phone number that MONEY had provided during the previous transaction. CI-1 stated s/he was instructed to go to the SUBJECT PROPERTY. Just before arriving, CI-1 called MONEY to say s/he was almost there. CI-1 stated that upon arriving at the Barton residence, an unknown male with whom CI-1 was unfamiliar was waiting at the door. The unknown male already had the packaged drugs in his hand, and he took the money from CI-1 and gave CI-1 the drugs without speaking.

d. The suspected controlled substances were then field tested by Detective Trooper Fauteux using a NARK II. The substance in glassine baggie tested presumptively positive for the presence of fentanyl.

e. Investigators later reviewed recordings of the event from devices provided to CI-1, and the recordings corroborated CI-1's description of the transaction. CI-1 was seen interacting with the unidentified male who had a short, dark beard and who was

16

wearing a stained white t-shirt. The unidentified male had the word "loyalty" tattooed on his right fingers.

*Week of the August 6, 2023 – Controlled Purchase with MONEY*

13. During the week of August 6, 2023, NVDTF arranged a controlled purchase of fentanyl from MONEY using CI-1.

a. Detective Trooper Fauteux observed some messages exchanged between CI-1 and MONEY prior to CI-1 meeting with him. CI-1 informed MONEY that s/he needed a certain amount of fentanyl and that s/he will be there in a certain amount of time.

b. Similar controls were employed during this purchase, in that CI-1 was briefed and searched prior to the purchase, was provided with recording and transmitting equipment, was provided prerecorded currency for the purchase, was surveilled to and from the purchase location, and was searched and debriefed after the purchase. NVDTF provided CI-1 with $280 for the purchase of fentanyl. Detective Sergeant Gardner observed CI-1 arrive at SUBJECT PROPERTY and leave approximately five minutes later.

c. Upon rejoining the NVDTF investigators, CI-1 surrendered numerous white glassine wax baggies bound by a rubber band containing suspected fentanyl and provided a sworn statement about the transaction. CI-1 stated s/he had met with MONEY when s/he had arrived at PARRIS's Barton residence. CI-1 gave MONEY the $280 NVDTF had provided for the purpose, and MONEY provided CI-1 the glassine baggies in exchange. CI-1 indicated that PARRIS, Derek Wells, and another unknown male was at the SUBJECT PROPERTY that day.

d. Detective Trooper Fauteux later tested the suspected controlled substances in the glassine bag with a NARK II, and the contents tested presumptively positive for the presence of fentanyl.

e. Investigators later reviewed recordings of the event from devices provided to CI-1. The recordings corroborated CI-1's description of the transaction with MONEY, who was visible on video recording.

*August 23, 2023 – Surveillance*

14. On August 23, 2023, I participated in an aerial surveillance mission in the vicinity of the SUBJECT PROPERTY. The aircraft used for surveillance on this occasion was equipped with a full-color camera with pan-and-zoom capabilities.

15. I am familiar with the SUBJECT PROPERTY from my participation in this investigation. During prior surveillance events, I observed multiple cars pulling into the driveway of the SUBJECT PROPERTY and subjects walking up to the side door of the residence. The subjects appear to have a short exchange at or near the door, and they then depart the area. Based on my training and experience, and my familiarity with the controlled purchases in this particular investigation, that behavior is consistent with the purchasing of controlled substances from the residence.

16. I observed a gold-colored sedan in the driveway of the SUBJECT PROPERTY on August 23, 2023. Multiple subjects stood outside of the vehicle for several minutes until a red crossover-style vehicle arrived in the driveway. One of the subjects near the gold sedan then stood near the red vehicle and spoke with the driver for a short period. The red vehicle then

18

departed the driveway. Moments later, the gold sedan also departed the driveway. The vehicles drove in separate ways when departing the Barton area.

17. Although the final controlled purchase conducted at the SUBJECT PROPERTY was in the week of August 6, 2023, based on the duration of the activities (from April until August) and the ongoing activities seen during surveillance, I believe the occupants of the SUBJECT PROPERTY likely have continued to engage in drug-related offenses and continued to use the SUBJECT PROPERTY for that purpose.

18. On August 28, 2023, I spoke with NVDTF Detective Trooper Fauteux, and he told me he had communicated with CI-1 on August 27, 2023. CI-1 stated that s/he had received a message from PARRIS via Facebook Messenger. CI-1 stated PARRIS informed CI-1 of the present price for a certain amount of fentanyl and indicated it was "fire" (which I know from my training and experience is slang for a particularly strong batch of a particular drug). CI-1 had informed PARRIS s/he will stop by this week, and PARRIS acknowledged CI-1's message.

*Criminal History Excerpts for BYRD and General Information*

19. I have reviewed criminal history database reports for Marvin BYRD ("TJ") as part of this investigation. I have not requested and reviewed any of the underlying documents informing the entries in these databases at this time. In my previous experiences, however, I have found such database entries to be accurate as to the dates of arrests, the bases of the arrests, and—where available—the disposition of any charges resulting from the arrests. Based on my review of information received from various law enforcement agencies in Connecticut, I observed the following entries among several others.

19

a. On September 2, 2015, BYRD appears to have been found guilty of a firearm possession charge and a probation violation in Hartford (Connecticut) District Court.

b. On July 26, 2017, BYRD appears to have been found guilty of a firearm possession charge in Hartford (Connecticut) District Court.

c. BYRD appears to have pending drug-related charges in Connecticut arising from a December 2019 offense.

d. On July 21, 2020, BYRD appears to have been found guilty of an offense entitled "Registration of person convicted of offense committed with a deadly weapon" in Hartford (Connecticut) District Court.

20. Based on my training, experience, and participation in other controlled substances investigations, I know the following:

a. Both small- and large-scale drug traffickers often maintain, on hand, large amounts of U.S. Currency obtained from the distribution of controlled substances and used to finance their ongoing drug businesses.

b. Controlled substance traffickers commonly maintain books, records, receipts, notes, ledgers, electronic/digital data (including on cell phones), money orders, and other documents relating to the transportation, acquisition, and distribution of controlled substances. Those records frequently include communications and photographs on cellular phones that are used to exchange text messages and communications in applications such as Facebook Messenger, Textnow, and WhatsApp.

c. Controlled substance traffickers often provide controlled substances on consignment (fronting them) to their clients.

d. The aforementioned books, records, receipts, notes, ledgers, etc. are commonly maintained where controlled substance traffickers can have ready access to them, particularly in their residences and stash locations.

e. It is common for both small- and large-scale drug traffickers to conceal contraband, proceeds of drug sales, and records of transactions in secure locations within their residence and/or other residences, either vacant or occupied by other members of the trafficking conspiracy (stash houses), and/or their businesses, to conceal them from law enforcement authorities.

f. Persons involved in both small- and large-scale drug trafficking commonly conceal in their residences, stash houses, and businesses caches of drugs, large amounts of currency, financial instruments (including stocks, bonds, certificates of deposit, etc.), precious metals, jewelry, automobile titles, other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to the attainment and concealment of large sums of money acquired from engaging in narcotic trafficking activities.

g. It is common practice for both small- and large-scale narcotic traffickers to travel to source areas to purchase and otherwise facilitate their trafficking. After purchasing controlled substances, the traffickers will transport narcotics (or cause them to be transported) to areas in which they will distribute them. Such methods of transportation in this region typically involve rented or borrowed vehicles or vehicles driven by "runners" who drive the vehicle containing proceeds or controlled substances in exchange for controlled substances.

h. Narcotics traffickers commonly maintain contact lists consisting of names, nicknames, screen names, addresses, and/or telephone numbers in books, documents, or digital data form. Those contact lists include information about their associates in the trafficking organization, their sources of supply, and their customers.

i. Drug traffickers often take or cause to be taken photographs of themselves, their associates, their property, their products, and proceeds from distributions. The photographs are usually maintained on devices at the residence and/or businesses of the traffickers.

j. Courts have consistently recognized that items and records demonstrating unexplained wealth constitute probative evidence of crimes motivated by greed—in particular, trafficking in controlled substances.

k. Drug traffickers commonly have in their possession (that is on their persons, in their vehicles, and at their residences and/or their businesses) firearms and ammunition to protect themselves, their controlled substances, and the proceeds from distributions from robberies. Those firearms often include pistols, revolvers, rifles, and shotguns, and they occasionally include machine guns, silencers, or other restricted weapons. Drug traffickers will also frequently trade controlled substances for other goods, to include firearms.

**Conclusion and Requests**

21. For the reasons described above, I submit there is probable cause to believe that Marvin BYRD (also known as "TJ"), "Money" (identity presently not known), and Britny PARRIS violated Title 21, United States Code, Sections 846 and 841 between at least April 2023 and the present by knowingly and intentionally conspiring with one another in the District of

22

Vermont and elsewhere to distribute and possess with intent to distribute fentanyl. I request the Court issue a Criminal Complaint charging them accordingly and warrants for their respective arrests.

22.     For the reasons described above, I submit there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841 have occurred in or at the SUBJECT PROPERTY at 194 West Street in Barton, Vermont. Further, probable cause exists to believe that the SUBJECT PROPERTY may contain evidence of those criminal offenses, contraband and fruits of those offenses, and property that has been used in committing those offenses. Further, the SUBJECT PROPERTY may contain individuals to be arrested—Britny PARRIS and Marvin BYRD. Accordingly, I request the Court issue a search warrant authorizing the search of the SUBJECT PROPERTY described in Attachment A and the seizure from that SUBJECT PROPERTY of items listed in Attachment B.

Dated at Burlington, in the District of Vermont, this _28th_ day of August, 2023.

_____
Tam Vieth, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me in Burlington, Vermont on this _28th_ day of August, 2023.

_____
HON. KEVIN J. DOYLE, Magistrate Judge
United States District Court
District of Vermont